**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Dean A. Johnson,

Plaintiff,

v.

Ryan Oldsmobile-Mazda-Aurora,
d/b/a Bob Ryan Oldsmobile, Inc.,

Defendant.

Civil No. 00-358 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Paul J. Lukas, Esq., Nichols, Kaster & Anderson, 4644 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402, appeared on behalf of Plaintiff.

Cynthia A. Bremer, Esq., Flynn & Gaskins, 2900 Metropolitan Center, 333 South 7th Street, Minneapolis, Minnesota 55402, appeared on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 12, 2001, pursuant to Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. In the Amended Complaint, Plaintiff alleges that Defendant violated the Americans with Disabilities Act and the Minnesota Human Rights Act by engaging in disability harassment and retaliatory conduct. For the reasons set forth below, Defendant's motion is granted in part and denied in part, and Plaintiff's motion is denied.

## Background

Plaintiff Dean Johnson is a forty-three year old auto body technician who struggles with dyslexia. From 1978 through 1998, Mr. Johnson worked as an auto body technician at Key Cadillac. In 1996, Mr. Johnson's son was diagnosed with leukemia. Because of health insurance limitations, it eventually became necessary for Mr. Johnson and his wife to administer

FILED JAN 26 2001
FRANCIS E. DOSAL CLERK
JUDGMENT ENTD
DEPUTY CLERK

intravenous treatments to their son at home. Thus, in 1998, Mr. Johnson sought employment with Defendant Bob Ryan Oldsmobile, Inc. (BRO). The dealership was closer to his home and handled a lower volume of work which would allow Mr. Johnson to spend more time with his family and to assist in administering his son's treatments.

When applying for the position with BRO, Mr. Johnson informed Gayle Lindahl, the general manager, that he was dyslexic and would need to bring the application home so that his wife could help him to complete it. Ms. Lindahl allowed him to do so. In August 1998, Mr. Johnson began work as an auto body technician for BRO.

During his first year of employment at BRO, Mr. Johnson was supervised by two different individuals. There is no indication that Mr. Johnson experienced any difficulty with either supervisor. According to Mr. Johnson, both supervisors were aware of his learning disability, read orders to him, and completed his paper and computer work much like how his former supervisors did at Key Cadillac.

In early summer 1999, Bob Ryan, being of no relation to the dealership owner, began work as the body shop supervisor. At the initiation of their working relationship, Mr. Johnson informed Mr. Ryan of his learning disability. It is under this supervisor that Mr. Johnson's alleged harassment and retaliation occurred.

Soon after Mr. Ryan began supervising the body shop, he implemented a time management system that required the shop technicians to write their hours on a sticker affixed to the back of a time ticket. In general, Mr. Johnson was able to independently comply with the sticker system, requiring only occasional assistance when multiple entries were involved. However, shortly thereafter, Mr. Ryan implemented yet another system that required the technicians to enter their time into the computer. Mr. Johnson had great difficulty complying

with the computer system because of his learning disability. On occasion, Mr. Johnson requested and received assistance from his co-workers and parts manager, Tim Sundberg. However, he did not consistently rely on their assistance, and instead, continued to log his time using the sticker system. There is no evidence before the Court of the establishment of a formal procedure to facilitate the entry of Mr. Johnson's time. In fact, Ms. Lindahl, Mr. Ryan, and Mr. Johnson's co-workers express divergent understandings of how Mr. Johnson was to be assisted in this matter.

On one occasion, Mr. Ryan unsuccessfully attempted to train Mr. Johnson on the computer.[1] On this occasion and others, Mr. Johnson repeatedly informed Mr. Ryan that his dyslexia prevented him from being able to operate the computer system. Mr. Johnson contends that Mr. Ryan often became hostile and angry with Mr. Johnson's inability to use the system and that he consistently displayed verbal and physical signs of his disdain for Mr. Johnson's inability to read and operate the computer. Mr. Johnson alleges that such conduct typically occurred on Mondays in response to the previous week's time entries, but it also occurred whenever timekeeping was at issue. Examples of Mr. Ryan's alleged behavior and comments are: (1) speaking to Mr. Ryan with a raised voice while waving his arms; (2) refusing to allow Mr. Johnson to continue with the sticker system and insisting that he learn the computer; (3) stating that he did not care and would not listen to Mr. Johnson's pleadings; (4) specifically stating "Don't give me any of this crap about you can't read"; (5) providing misinformation to Mr. Johnson when asked to read him an estimate; and (6) repeated and excessive questioning

---

[1] In fact, Mr. Johnson asserts that Mr. Ryan himself was unable to enter information and stated that he would need to have more training.

about whether Mr. Johnson had entered his time while not treating other technicians in this manner.

In August 1999, Mr. Johnson spoke with Ms. Lindahl to explain his inability to track his time on the computer and the manner in which Mr. Ryan had been treating him because of this. Ms. Lindahl assured Mr. Johnson that his concerns would be addressed. Ms. Lindahl then relayed her conversation with Mr. Johnson to Jim Skeie, Mr. Ryan's supervisor. Mr. Skeie subsequently spoke with Mr. Ryan telling him to adjust his behavior because an employee had complained about his harsh manner. Mr. Skeie did not tell Mr. Ryan that it was Mr. Johnson who had complained.

For a brief period after his conversation with Ms. Lindahl, Mr. Johnson reported to several people, including Lindahl, that the situation with Mr. Ryan had improved. However, Mr. Johnson alleges that Mr. Ryan subsequently resumed his previous treatment of him. On September 7, 1999, Mr. Johnson contends that Ryan angrily confronted him demanding his missing time ticket from the previous week.[2] After Mr. Johnson could not find the ticket, Mr. Ryan continued to ask for the ticket and express anger about Mr. Johnson's inability to operate the time system. Having become profoundly upset and distracted from his work, Mr. Johnson walked off the job on September 7, 1999.

During the course of his employment at BRO, Mr. Johnson reports that the situation with Mr. Ryan caused him to lose weight, lose his appetite, lose sleep, suffer from headaches, and develop an ulcer. After leaving BRO on September 7, 1999, Mr. Johnson reports that he was emotionally distraught, and he could not get out of bed. After several days, Mr. Johnson went to

---

[2] Incidentally, the time ticket in question was nonexistent because Mr. Johnson had taken the relevant day off so that he could take his son to a doctor's appointment.

work on some concrete jobs arranged by his father-in-law. Mr. Johnson currently works for Village Chevrolet. Both parties agree that Mr. Johnson never received any reports that his technical work at BRO was less than satisfactory.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Issues**

a. <u>In General</u>

Mr. Johnson claims that BRO has violated both the Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA) by engaging in disability discrimination and retaliation.[3] 42 U.S.C. § 12201, *et seq.*; Minn. Stat. § 363.01, *et seq.* In footnote 2 of his Memorandum in Opposition to Defendant's current motion, Plaintiff has withdrawn Counts II and IV of his complaint, leaving before the Court only the counts of disability discrimination. Defendant BRO has moved this Court to issue summary judgment on both remaining claims. Mr. Johnson opposes BRO's motion in its entirety and moves the Court to issue partial summary judgment on the issues of whether Mr. Johnson is "disabled" and "qualified disabled" for purposes of the ADA.

b. <u>Disability Discrimination</u>

i. In General

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court set forth a three-stage burden-shifting test that has been consistently applied in discrimination cases. *See Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997) (adopting *McDonnell Douglas* test as applied in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 520 (1993).). The first stage requires that the plaintiff establish a *prima facie* case of discrimination. *Ryther*, 108 F.3d at 836. If the plaintiff

---

[3] The courts of the Eighth Circuit have consistently analyzed claims under the MHRA disability provision as analogous to claims under the ADA. *See, e.g., Miners v. Cargill Communications, Inc.*, 113 F.3d 820 (8th Cir. 1997), *cert. denied*, 118 S. Ct. 441 (1997); *Roberts By and Through Rodenberg-Roberts v. KinderCare Learning Centers, Inc.*, 86 F.3d 844 (8th Cir. 1996).

To the extent that Plaintiff's memorandum implies a claim for failure to accommodate, the Court finds that such a claim was not properly alleged in the Complaint.

is successful, then the burden shifts to the defendant who is required to provide evidence of a valid, non-discriminatory reason for the alleged discriminatory conduct. *Id.* Should the defendant produce such evidence, then the burden shifts back to the plaintiff requiring him/her to prove intentional discrimination. *Id.* The plaintiff is not required to present new evidence at this stage. Instead, it is sufficient for the plaintiff to rely on the evidence presented to establish the *prima facie* case coupled with the claim that the defendant's reason is mere pretext. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2108-09 (June 12, 2000).

A *prima facie* case of disability discrimination requires proof that: (1) the plaintiff suffers from a disability that substantially limits a major life activity; (2) he is qualified to perform the essential functions of the job, with or without accommodation; and (3) he has suffered an adverse employment action because of his disability. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111-12 (8th Cir. 1995). For purposes of Defendant's motion, the parties do not dispute the first two elements of the *prima facie* case.[4] The parties have focused their dispute on the third requirement of the *prima facie* case, i.e. adverse employment action. The Plaintiff has characterized the "adverse employment action" in two ways: (1) constructive discharge, and (2) disability harassment.

ii. Constructive Discharge

"A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate [his] employment." *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir.

---

[4] The second element, whether Mr. Johnson is "qualified disabled," is disputed by the Defendant in response to Plaintiff's Motion for Partial Summary Judgment. As the Court explains below, it declines to issue summary judgment on either of the first two elements of Plaintiff's *prima facie* case.

2000). A plaintiff must provide the employer a reasonable opportunity to resolve the "unreasonable working condition[s]" before terminating his employment. *Henderson*, 217 F.3d at 617. If a reasonable opportunity is granted and no remedial action is taken, or the employee reasonably believes that there is no chance of fair treatment, then the employee has been constructively discharged. *Id.*

The unreasonable condition that Mr. Johnson describes is the alleged regular berating and verbal abuse by Mr. Ryan because of Mr. Johnson's disability and corresponding inability to use the computer. The parties agree that Mr. Johnson alerted BRO to this condition on one occasion. The parties also agree that subsequent to informing BRO, Mr. Johnson's concerns were addressed and the unreasonable condition was resolved. While Mr. Johnson contends that the condition resumed shortly thereafter and ultimately caused him to terminate his employment, there is no evidence before the Court that he provided BRO further notice and a corresponding opportunity to resolve the reoccurrence of the unreasonable condition. The Court is not implying that an employee must endure continuous discrimination and repeatedly provide notice and opportunity to an employer that has consistently failed to provide effective resolution. Rather, the Court finds that the evidence does not portray BRO as an unresponsive employer to which a second notice and opportunity to resolve Mr. Johnson's situation would have been futile. Thus, Plaintiff's claims are without merit to the extent that they are based on a theory of constructive discharge.

iii. Disability Harassment

Mr. Johnson's claims of disability harassment have merit. This District and the Eighth Circuit have yet to explicitly recognize or reject such a claim. *See Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723 (8th Cir. 1999) (declining to reach issue of existence of disability

harassment claim because dismissed for lack of evidence to establish "because of" element); *Wallin v. Minnesota Dept. of Corrections*, 974 F. Supp. 1234 (D. Minn. 1997) (assuming existence of disability harassment claim, evaluating under sexual harassment standard, and dismissing for insufficiency of "mere utterance"). The Court concludes, however, that it is proper to recognize such a cause of action consistent with the purpose of the ADA–to prohibit discrimination in the workplace against members of certain classes–and relevant case law developed in this and other districts. *See Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 666-67 (3rd Cir. 1999) (assuming disability harassment cause of action under ADA); *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) (recognizing disability harassment cause of action under ADA); *Hiller v. Runyon*, 95 F. Supp. 2d 1016, 1023 (S.D. Iowa 2000) (recognizing disability harassment cause of action under Rehabilitation Act relying on parallel ADA case law); *Leland v. U.S. Bank National Ass'n*, 1999 WL 778569, *7-9 (D. Ore. 1999) (assuming existence of disability discrimination cause of action under ADA); *McClain v. Southwest Steel Co., Inc.*, 940 F. Supp. 295, 301-02 (N.D. Okla. 1996) (recognizing disability harassment cause of action under ADA); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1106 (S.D. Ga. 1995) (recognizing disability harassment cause of action under ADA).

The Plaintiff has unnecessarily characterized the alleged disability harassment as satisfaction of the aforementioned "adverse employment" requirement. Rather, disability harassment constitutes a distinct cause of action subject to a different legal analysis, albeit with elements overlapping those of *prima facie* discrimination. In *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir. 1998), the court held that the plaintiff's disability harassment argument was meritless because she had failed to establish a *prima facie* case of discrimination. The *Moritz* holding, however, does not preclude the aforesaid conclusion because the court's

holding was based on the plaintiff's inability to establish whether she was "qualified disabled"–an element overlapping with the disability harassment analysis that will be discussed below.

The ADA states that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Nearly identical language in Title VII has been held to create a cause of action for harassment in the form of a hostile work environment. *Walton*, 168 F.3d at 666 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989)). Thus, the proper analysis of a disability harassment claim mirrors the test set forth under Title VII in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) and requires a showing that: (1) the plaintiff is qualified disabled with a disability recognized under the ADA; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was because of plaintiff's disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt effective remedial action. *See, e.g., Walton*, 168 F.3d at 667; *Wallin*, 153 F.3d at 688.

For purposes of this motion, the parties have agreed that Mr. Johnson is disabled under the ADA. To the extent that the parties disagree that Mr. Johnson is "qualified disabled," a factual dispute remains, though the Defendant has not clearly identified the evidence to support its argument and rebut that of Plaintiff on this issue. As the Court has previously stated and will discuss below, it declines to issue summary judgment on either of these two issues, yet it finds the relevant evidence presented to contribute to the survival of Plaintiff's harassment claims.

As to the second and third requirements, the Court finds that the Plaintiff has presented sufficient evidence to establish a *prima facie* case of harassment. Even if the only conduct at issue in this case is the single comment "Don't give me any of that I can't read crap," it is clear that the comment was an offensive remark and was made "because of" Mr. Johnson's disability. The parties agree that such conduct occurred. The Defendant, however, would have the Court's analysis stop here, arguing that the only conduct at issue is the single comment and thus, a "mere offensive utterance." *Harris*, 510 U.S. at 23 (finding that a "mere offensive utterance" is insufficient to constitute harassment). The Court declines to do so.

The factual dispute in this case focuses on the extent and nature of the conduct at issue. The Defendant is correct in its position that a single comment is generally insufficient to satisfy the requirements that the relevant harassment be "severe" or "pervasive." The evidence before the Court, however, does not indicate that the specific comment both parties have quoted is without companions. Mr. Johnson has represented to the Court, without significant response or explanation by the Defendant, that comments of a similar nature were made by Mr. Ryan on a regular basis, particularly on Mondays. The Defendant appears to presume that because the Plaintiff is unable to restate the alleged harassing incidents verbatim that they did not occur or could not have been harassing. The Court disagrees. To the extent that such comments were made and reflected a sentiment similar to the aforementioned specific comment, the Plaintiff has presented a genuine issue of material fact as to whether such conduct was sufficiently "severe" or "pervasive."

A factual dispute remains also on the issue of whether BRO knew or should have known of the complained of conduct and whether they failed to take prompt or effective action. Such a finding is not inconsistent with the Court's earlier conclusion that the Plaintiff's constructive

discharge claim is meritless. It is undisputed that BRO was put on notice of Mr. Ryan's treatment of Mr. Johnson. The nature and substance of Mr. Johnson's complaint to Ms. Lindahl sufficiently communicated that Mr. Ryan's offensive treatment was perceived as being made because of Mr. Johnson's dyslexia. The efficacy of Ms. Lindahl's response remains at issue. Defendant admits that Mr. Ryan was not informed of the specific nature of Mr. Johnson's complaint, and Plaintiff alleges that the harassing conduct resumed shortly thereafter. The fact that Mr. Johnson ultimately terminated his employment does not eliminate the question of whether BRO's response was effective and ultimately whether actionable disability harassment occurred. Thus, the Court declines to issue summary judgment in favor of the Defendant.

c. <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff moves the court for summary judgment in his favor on the issues of whether the evidence supports findings that he is both "disabled" and "qualified disabled" under the ADA. The Court declines to do so. Plaintiff's counsel contends that the parties had reached an informal understanding via written communication that Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment would incorporate Plaintiff's Motion for Partial Summary Judgment. Nonetheless, the formal notice and filing requirements set forth in the Local Rules were not followed.

In general, the Court encourages attorneys to work together to negotiate and sometimes resolve issues involved in litigation. The Court, however, does not allow for such informality to circumvent formal rules and procedures nor to exclude the Court from the litigation process. Our local rules have been established to maintain order and efficiency in the litigation process, and to disregard them for the sake of convenience is unacceptable. Thus, the Court declines to consider Plaintiff's Motion for Partial Summary Judgment due to its untimely and improper filing.

For the reasons stated, **IT IS HEREBY ORDERED**,

1. Defendant's Motion for Summary Judgment is **DENIED** as to Counts I and III and **MOOT** as to Counts II and IV; and

2. Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

Dated: January 26, 2001

DONOVAN W. FRANK
Judge of United States District Court